1    Dana J. Oliver, Esq. (SBN: 291082)
     dana@danaoliverlaw.com
2    OLIVER LAW CENTER, INC.
     8780 19th Street #559
3    Rancho Cucamonga, CA 91701
     Telephone:  (855)384-3262
4    Facsimile:  (888)570-2021

5    Attorney for Plaintiff and Putative Class

6

7                   **UNITED STATES DISTRICT COURT**
              **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

8    AMBER FERRELL, individually and        Case No. 2:25-cv-1324
9    on behalf of all others similarly situated,

10                                           The Hon. Sherilynn Peace Garnett
              *Plaintiff,*

11                                           **PLAINTIFF'S RESPONSE IN**
                                             **OPPOSITION TO**
12   *v.*                                    **DEFENDANT'S MOTIONS TO**
                                             **COMPEL ARBITRATION AND**
13                                           **TO DISMISS**

14   COLOURPOP COSMETICS, LLC            Hearing Date: July 9, 2025
15                                       Time: 1:30 p.m.
              *Defendant.*               Courtroom: 5C
16
                                         Complaint Filed: February 14,
17                                       2025

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Defendant Colourpop Cosmetics, LLC moves to compel arbitration based on a so-called sign-in-wrap agreement—an online format in which purported assent to terms is inferred from a user creating an account or completing a transaction, without requiring the user to click a box indicating agreement to the terms themselves. Courts view sign-in-wrap agreements with skepticism because they often fail to provide users with adequate notice or a meaningful opportunity to assent. Unlike clickwrap agreements, which require users to affirmatively click "I agree" to terms presented directly to them, sign-in-wrap agreements rely on passive conduct and buried hyperlinks. Because the alleged agreement here does not reflect clear and unambiguous consent to arbitrate, Colourpop's motion should be denied.

In the alternative Colourpop asks this Court to dismiss this case under Fed. R. Civ. P. 12(b)(6) arguing that cell phones are not residential numbers and therefore not subject to the TCPA's DNC protections. That argument lacks merit because the TCPA's protections for numbers listed on the National Do Not Call Registry apply to both residential landlines and cell phones. Courts have repeatedly confirmed that the statute does not exclude cell phones from the definition of "residential" numbers for purposes of DNC protections. Individuals increasingly rely on cell phones as their primary—often sole—means of communication, and the statutory purpose of shielding consumers from unwanted telemarketing calls would be undermined by

arbitrarily excluding cell phones from coverage. Accordingly, the Court should reject ColourPop's argument under Rule 12(b)(6).

### Background

This case challenges ColourPop Cosmetics, LLC's practice of sending unsolicited telemarketing text messages to consumers whose telephone numbers are registered on the National Do Not Call Registry. Plaintiff Amber Ferrell brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, which prohibits repeated telemarketing communications to individuals who have taken the affirmative step of placing their numbers on the national Do Not Call list. Plaintiff's cell phone number has been listed on the National Do Not Call Registry for more than thirty days before any of the messages at issue. She uses the number for personal, non-commercial purposes. Beginning in or around October 2024 and continuing through January 2025, ColourPop—either directly or through affiliates or agents—sent multiple text messages advertising its products to Plaintiff's number. The messages were not personalized to Plaintiff, and she never provided prior express consent, invited further communications, or had any existing business relationship with ColourPop. These messages were not isolated or mistaken outreach. Plaintiff alleges they reflect a broader pattern of noncompliant marketing behavior by ColourPop, targeting consumers nationwide with unsolicited promotional texts despite their numbers being listed on the Do Not Call Registry. On behalf of herself

and a putative class, Plaintiff seeks statutory damages and injunctive relief for ColourPop's repeated violations of the TCPA.

## Argument

### 1. There is no agreement to arbitrate because Ms. Ferrell never gave ColourPop her phone number or signed up for anything.

To be bound be a sign-up wrap agreement a consumer needs to actually sign up for the service attached to the purported arbitration agreement. Ms. Ferrell never gave ColourPop her phone number, never saw the website in question, and never consented to receive text messages, let alone agreed to arbitrate.

As the party seeking to arbitrate, Defendant bears the burden of demonstrating, at the same level as at summary judgment, *both* that legally valid arbitration agreement exists and that the *Plaintiff herself* agreed to be bound by the clause of which he had adequate legal notice, both points which will be addressed below. *Robert D. Mabe, Inc. v. OptumRX*, 43 F.4th 307, 329 (3d Cir. 2022) ("Because it is plausible that a number of the pharmacies were never given the terms of their Provider Agreements, it is likewise plausible that holding the pharmacies to the arbitration agreements contained therein would be procedurally unconscionable.").

The Supreme Court recently addressed the proper procedure to follow when conflicts arise as to the existence of arbitration contracts. *Coinbase, Inc. v. Suski*, 602 U.S. 143, 143 (2024). The Supreme Court held that the first question in any arbitration dispute must be what the parties agreed to. *Id.* at 145. The Supreme Court

clarified that *this* "fundamental" question is one for the *court*, not the arbitrator, to

decide, and is driven by contractual interpretation principles under state contract law.

*Id.* In *Coinbase*, the Supreme Court reaffirmed that "where, as here, a challenge

applies "equally" to the whole contract and to an arbitration or delegation provision, a

*court* must address that challenge." *Id.* at 151 (*quoting Rent-A-Ctr., W., Inc. v.

Jackson,* 561 U.S. 63, 71 (2010). The Court went on to explain that in such cases, just

like here, "basic principles of contract and consent require that result. Arbitration and

delegation agreements are simply contracts, and, normally, if a party says that a

contract is invalid, the court must address that argument before deciding the merits of

the contract dispute." *Id.* (quoting *Rent-A-Ctr.*, 561 U.S. at 71 for the proposition that

"If a party challenges the validity . . . of the precise agreement to arbitrate at issue,

the federal court must consider the challenge before ordering compliance with that

[arbitration] agreement."). And the explicit text of Section 4 makes it clear that

formation is a *jury* issue, "upon such demand the court shall . . . specially call a jury

for that purpose. If the jury find that no agreement in writing for arbitration was made

or that there is no default in proceeding thereunder, the proceeding shall be

dismissed." 9 U.S.C. § 4. As such, a jury trial is necessary to ascertain if the Plaintiff

herself submitted her information to Defendant's website and thus agreed to arbitrate,

as the evidence in support of this is disputed.

Consistent with the "general proposition" that "a contract cannot bind a non-

party," *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 9 (1st Cir. 2014),

"the FAA does not require parties to arbitrate when they have not agreed to do so,"

*Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489

U.S. 468, 478 (1989). The FAA commands that, before compelling arbitration of a

dispute, the Court must first be satisfied that the parties agreed to arbitrate that

dispute. 9 U.S.C. § 4; *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*

*Inc.*, 473 U.S. 614, 626 (1985) ("[T]he first task of a court asked to compel arbitration

of a dispute is to determine whether the parties agreed to arbitrate that dispute.").

And, "[i]f the making of the arbitration agreement . . . be in issue, the court shall

proceed summarily to the trial thereof." 9 U.S.C. § 4.

Under California law, the party arguing the existence of a valid contract to

arbitrate bears the burden of proving the contract existed and was formed, and that

the *Plaintiff themselves* agreed to be bound by the clause. *Engalla v. Permanente*

*Med. Grp., Inc.*, 938 P.2d 903, 915 (Cal. 1997). As the party seeking to arbitrate, the

Defendant bears the burden of demonstrating, at the same level as at summary

judgment, not only that a valid arbitration agreement exists but also that the *Plaintiff*

*himself* agreed to be bound by the clause. *See Campbell v. Gen. Dynamics Gov't Sys.*

*Corp.*, 407 F.3d 546, 552 (1st Cir. 2005). Defendant will be unable to do so because

the Plaintiff denies ever having submitted her information to Defendant's website. All

the information the Defendant has is outlined below:

| ColourPop's Allegation | Truth |
|---|---|
| Plaintiff voluntarily visited ColourPop's | Plaintiff never visited |

| ColourPop's Allegation | Truth |
|---|---|
| website. | ColourPop's website |
| Plaintiff clicked the "Get 15% OFF NOW when you sign up for email and texts" button. | Plaintiff never clicked on any button Defendant's website. Indeed, she never visited the website. |
| Plaintiff then sent the confirmation SMS ("Send this text to subscribe…") from her number to opt in. | Plaintiff never texted ColourPop anything. |
| Plaintiff immediately received and used ColourPop's welcome/promotional texts (including a discount code). | Plaintiff never received or used any welcome or promotional code from ColourPop—and never entered a discount code or otherwise engaged with such texts. |
| Plaintiff's user-agent metadata (iPhone/Instagram browser string) confirms she completed the web flow. | Plaintiff did not access ColourPop on Instagram or on her iPhone—she has no record of ever navigating a ColourPop website on any device. |

Further undermining ColourPop's attempt to argue that Plaintiff Amber Ferrell entered into an arbitration agreement with it is that its text message communications with her are addressed to a person named "Shana." Shana is not Amber Ferrell and Plaintiff believes the messages were sent to her intended for someone else. Ferrell Declaration ¶5.

Because Ms. Ferrell never submitted her information to Defendant, she never consented to arbitrate her claims. At this stage, particularly as this case raises a factual challenge surrounding arbitrability, the Plaintiff is entitled to submit a

declaration of his own in support of his position that he did not agree to arbitrate the

dispute as an initial matter. *Gerrish v. Coast Pump & Supply Co.*, No. 8:21-cv-365-

JSS, 2021 U.S. Dist. LEXIS 202979, at *2-4 (M.D. Fla. Oct. 21, 2021).

To be clear, the Plaintiff denies ever having agreed to arbitrate. Plaintiff

confirms that she did not visit the website, had nothing to do with the visit, and thus

did not agree to arbitrate anything. (Ferrell Dec. ¶ 4). These factual disputes create

issues of material fact and entitle Plaintiff to a summary arbitrational jury trial.

Despite the Defendant's faulty evidence which demonstrates that it possesses

no information that the Plaintiff herself, and not something like a website scraper or

bot submitted Plaintiff's information, and the Plaintiff's own denials, Defendant's

motion is rife with the false and unsupported assertion that the "Plaintiff" submitted

*her* phone number. But, under well-established TCPA and arbitration law, the

Defendant must establish that the Plaintiff *herself*, and not someone else, agreed to

arbitrate claims. *Starling v. OnProcess Tech., Inc.*, No. 1:23-CV-10949-JEK, 2024

WL 1258501, at *5 (D. Mass. Mar. 25, 2024) (denying motion to compel arbitration

and holding non-signatory family member was not bound by arbitration agreement

despite being listed as an alternate contact on account).

Several decisions dictate that the Defendant's motion ought to be denied on the

basis of the Plaintiff's declaration *alone*. The Middle District of Georgia's decision in

*Hobbs v. Apollo Interactive, Inc.*, No. 4:19-CV-57 (CDL), 2019 WL 6878863 (M.D.

Ga. Dec. 17, 2019), is particularly instructive. There, a TCPA defendant sought to

compel arbitration by contending, as here, that the plaintiff agreed to an arbitration

provision as a result of his visits to the defendant's website. In finding no agreement

to arbitrate existed, the court explained:

> Plaintiff presented evidence that he "did not visit
> www.bestautoinsurance.com" and that it would have been impossible
> for him to access the website in the manner Defendant says he did. . . .
> Plaintiff stated that he "cannot know for certain who accessed"
> Defendant's website and input his information, but "[w]hat [he] do[es]
> know for certain is that [he] did not visit www.bestautoinsurance.com."
> From this, a reasonable factfinder could determine that Plaintiff did not
> enter his personal information on Defendant's website or click
> "submit." So, a reasonable factfinder could conclude that Plaintiff did
> not assent to the website's terms, including the arbitration provision.
> Accordingly, there is a genuine fact dispute as to whether Plaintiff
> entered an arbitration agreement with Defendant, and the Court thus
> cannot conclude as a matter of law at this stage in the proceedings that
> the parties had a valid agreement to arbitrate. For this reason,
> Defendant's motion to dismiss in favor of arbitration is denied.

*Id.* at \*1-\*2 (cleaned up). Hobbs is one of several in a long line of cases either

denying such motions outright or ultimately concluding that a summary arbitration

trial was necessary. *E.g.*, *Gilliam v. Prince Health Grp. LLC*, No. 1:24-CV-00033,

2025 WL 1126545, at \*4 (M.D. Tenn. Apr. 16, 2025 ("[O]ther than the fact that

Plaintiff's name and phone number were used, Prince Health offers no evidence that

Plaintiff was the person who entered the information."); *Woodard v. SmartMatch Ins.*

*Agency, LLC*, No. 23 CV 5246, 2024 WL 4252803, at \*3 (N.D. Ill. Sept. 20, 2024).

The Court in *Conrad v. Camping World Holdings Inc.* reached a similar

conclusion, reasoning that the factual question of whether the plaintiff opted in to

receive text messages from the defendant on a website containing an arbitration

provision was put at issue and denied a similar motion to compel arbitration. No.

4:24-CV-171-CLM, 2025 WL 66689, at *2 (N.D. Ala. Jan. 9, 2025). There, the court first agreed that its decision "as to whether an arbitration agreement exists is simply a matter of contract," and that when a party does not "sign or otherwise enter the contract, he cannot be bound by its terms." *Id.* The court noted that the defendant provided no evidence to controvert the plaintiff's declaration, as here, that he did not agree to arbitrate any claims because he did not own the telephone number at issue at the time of the alleged opt-in, and thus that the defendant could not "show the parties had a meeting of the minds about arbitrating claims related to the CWH text message service." *Id.*

As a result, Defendant has been and will be unable to meet its burden of demonstrating even a genuine issue entitling the Plaintiff to wholesale denial of the motion. The court in *Conrad* did the same, holding as a matter of law that the defendant did not meet its burden of demonstrating a disputed factual issue with respect to the claimed provision to justify an arbitration trial. *Id.* And, like in *Hobbs*, the Plaintiff has made similar allegations of faulty arbitrational facts, including her mismatched information. 2019 WL 6878863, at *1–*2. And because the Plaintiff agreed to nothing, she did not agree to arbitrate or receive calls.

**2. *Even if Ms. Ferrell ever gave Colourpop her phone number, there is no agreement to arbitrate because Ms. Ferrell could not manifest consent and the terms were not presented with sufficient conspicuousness to put her on inquiry notice.***

"Arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 664 (2010). The Court has reiterated that, despite the FAA's liberal policy favoring arbitration, "consent" remains the "first principle that underscores" every arbitration decision. *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019). Because arbitrators wield only the authority the parties grant them, the clause ColourPop invokes is unenforceable unless Ms. Ferrell actually agreed to it. She did not.

Under California law a sign-in-wrap contract forms only when two elements are satisfied: (1) reasonably conspicuous notice of the terms and (2) unambiguous manifestation of assent. *Godun v. JustAnswer LLC*, 135 F.4th 699, 709–11 (9th Cir. 2025); *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857–58 (9th Cir. 2022); *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025). The first element demands clear text, prominent placement next to the action button, and visual design cues a prudent user cannot miss. *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1018 (9th Cir. 2024). The second requires that the site expressly state that clicking "Sign Up," "Continue," or the like constitutes agreement to the Terms; absent that express linkage, no contract arises.

### A) Ms. Ferrell did not—and could not—manifest her consent to arbitrate.

Defendant's purported arbitration agreement fails as a matter of law because there was no way for her to manifest consent, even assuming she ever gave

Colourpop her phone number (she did not). The terms were purportedly displayed to

Ms. Ferrell as follows:



See Defendant's motion. The language Ms. Ferrell allegedly saw—"By signing up

you agree to receive marketing text messages"—mentions only promotional texts and

never states that "signing up" binds her to any Terms or arbitration clause. Because

the alleged Terms were buried behind an indistinct hyperlink and never tied to the

"Sign Up" action, there was neither conspicuous notice nor unambiguous assent.

Under the FAA's "first principle" of consent, ColourPop cannot compel Ms. Ferrell

to arbitrate—even assuming she ever signed up for the emails and texts in question,

which—to be clear—she did not.

The Ninth Circuit's recent decision in *Kseniya Godun* v. *Just Answers LLC* is

dispositive. There the Court held that an advisal beginning with "I agree" without

explicitly saying what action constitutes agreement was not enough to constitute

consent to arbitrate. *Godun*, 135 F.4th at 712-13 (9th Cir. 2025). Here by contrast,

there is no language whatsoever indicating that the user even agrees at all to the

terms. The terms are presented with no indication that the user agrees to them or

indication of how the user could agree to them.

Likewise, *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) also controls the outcome here. In *Berman*, the defendant pointed to a pre-checked "I agree" box and an adjacent "Terms & Conditions" hyperlink, arguing that users had assented by clicking "Continue." The Ninth Circuit rejected that argument: it held that an advisal simply stating "I understand and agree to the Terms & Conditions" – without expressly telling the user that clicking the button would bind them – fails to unambiguously manifest assent. *Id.*, at 857–58. Because Colourpop's landing page likewise never links any user action to acceptance of its Terms (tying "Sign Up" only to marketing texts and offering "View Terms & Privacy" as a passive hyperlink), *Berman* compels the same result: no consent, no contract, and no enforceable arbitration agreement. But the facts here are worse than those in *Berman*. In *Berman*, the website at least displayed the phrase "I understand and agree to the Terms & Conditions," albeit without linking that phrase to an action. *Berman*, 30 F.4th at 853 (9th Cir. 2022) Here, by contrast, Colourpop's sign-up screen contains no language whatsoever suggesting the user agrees to any Terms, let alone a binding arbitration clause. With no invitation to consent—no "I agree," no "By clicking…" advisal, nothing—the user's click cannot manifest assent under *Berman*'s consent-first rule, and no arbitration agreement exists.

### B) The arbitration terms were not sufficiently conspicuous.

The hallmark of the enforceability of a clickwrap agreement is the conspicuousness of its notice. *See Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30 (2d Cir. 2002). An offeree is "not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Id.* Courts have held, burying the purported arbitration agreement under the "Terms" link on the page, which is buried among 9 other links across two sets of text boxes, is a game of hide-and-seek insufficient to give notice of the fact this link rather than any one of the other 9 links also on the page, is the one which contains the arbitration provision. *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 765 (N.D. Cal. 2019) ("Users cannot be reasonably expected to click on every word of the sentence in case one of them is actually a link.").

The Ninth Circuit set out the standard for conspicuousness in *Berman*: a website must (1) display any notice of its terms in a font size and format such that a reasonably prudent Internet user would have seen it and (2) render hyperlinks to those terms readily apparent—typically by using contrasting color or all-caps—not merely by underscoring. See *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849, 856–57 (9th Cir. 2022); *see also Nguyen v. Barnes & Noble*, 763 F.3d 1171, 1177 (9th Cir. 2014). Here, the only textual notice of terms appears in a block of tiny, pale gray text buried immediately below the headline "YOU'VE WON 15% OFF your first order" and above the "GET 15% OFF NOW" button—font so small and low-contrast that it is barely legible to the naked eye. A reasonably prudent user's attention is drawn

instead to the large promotional headers and call-to-action button. Compounding the problem, the "View Terms & Privacy" linkage is not distinguished by color or capitalization and is shown only as underlined text in the same diminutive font as the surrounding copy. Under *Berman*, this notice is "the antithesis of conspicuous" and fails both prongs of the conspicuousness test. *See Berman*, 30 F.4th at 856–57.

Courts in other circuits have found similar terms insufficiently conspicuous. For example, in *Rojas v. GoSmith, Inc.*, another TCPA case "Defendant did nothing that drew attention to [the arbitration provision] . . . [and] [n]o evidence shows any indication that Plaintiff was advised to read the entirety of the webpage." 2020 WL 831585, at *4 (N.D. Ind. Feb. 20, 2020). Other courts have followed similar reasoning. *See, e.g.*, *Walker v. Nautilus, Inc.*, 541 F. Supp. 3d 836, 841 (S.D. Ohio 2021) (holding that given the inconspicuous nature of the website's terms of use, plaintiff had neither actual nor constructive notice of arbitration provision and therefore could not assent to it). This makes this case like *Schuchmann v. Great Am. Power LLC*, where the Middle District of Pennsylvania denied a motion to compel arbitration in a TCPA case when "the record as developed so far does not indicate that Plaintiff had been informed of the arbitration clause," based on far less problematic website content than here. No. 3:23-CV-1604, 2024 WL 219267, at *4 (M.D. Pa. Jan. 19, 2024). As such, because the website did not draw notice to the arbitration provision or the link containing the relevant terms

Because any alleged agreement to arbitrate did not provide conspicuous notice

of the arbitration provision, the Court must also deny the Defendant's motion on

independent legal grounds, even if the Court were to hold, *arguendo*, that the Plaintiff

agreed to arbitrate something as a factual matter.

3.  ***Cellular telephones can be residential under binding 9th Circuit precedent
    and the Plaintiff has alleged as such.***

Defendant argues that this case should be dismissed under rule 12(b)(6)

because cell phones are not residential phones and are thus not entitled to DNC

protections. In seeking to circumvent the Do Not Call Registry, Defendant relies on

several cases—none of them from this Circuit. There is a reason for that: under

binding 9th Circuit precedent cell phones are residential numbers.

> We know, as discussed above, that the FCC has concluded that
> a cell phone is presumptively residential. We also know, as
> discussed above, that the FCC has concluded that a phone—
> whether a landline or a cell phone—can be residential even when
> used for both personal and business purposes. What we do not
> know, because the FCC has explicitly declined to say, is when a
> mixed-use phone—whether a landline or a cell phone—ceases to
> become a residential phone and becomes a business phone. In the
> absence of FCC guidance on this precise point, we hold that
> plaintiffs' registered cell phones that are used for both personal and
> business purposes are presumptively "residential" within the
> meaning of § 227(c).

*Chennette v. Porch.Com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022).

This holding standing alone renders all the out-of-circuit precedent relied on by

Defendant irrelevant. Yet even if the Court were not bound by the holding in *Chennette*

it should still hold that cell phones are residential for the purposes of the DNC.

Defendant's claim that a cell phone cannot qualify as a "residential" telephone

number—and that no cellular subscriber is entitled to the TCPA's Do Not Call protections—rests on an interpretation that is, at best, "a bit strained as an initial matter." *Riley v. California*, 573 U.S. 373, 397 (2014). As with any question of statutory interpretation, the analysis "begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). That analysis confirms that cell phones used for personal, non-commercial purposes are plainly eligible for protection under the National Do Not Call Registry.

In enacting the Do Not Call provisions of the TCPA, Congress extended protection to "residential telephone subscribers." 47 C.F.R. § 64.1200(c)(2). Defendant asks this Court to read that term as excluding cell phones used for personal, household purposes. But that reading conflicts with both the text and structure of the statute. There is no statutory definition of "residential," so the term must be given its "ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). And under the fixed-meaning canon, the Court must interpret the word as it was understood when Congress enacted the provision. Reading Law 78 (Scalia & Garner, 2012). As Plaintiff has alleged—and as this Court must accept at the pleading stage— her cell phone was used for personal, noncommercial purposes. *See* ECF No. 23 at ¶¶12-13. *See e.g. Izor v. Abacus Data Sys., Inc.*, No. 19-CV-01057-HSG, 2019 WL 3555110, at *2 (N.D. Cal. Aug. 5, 2019) ("[the plaintiff] alleges that '[h]is cellular phone number is not currently associated with a business and is for personal use." . . . [and that he] "registered his cellular phone number on the [do-not-call list]'. The Court

thus finds no categorical bar to Plaintiff alleging a violation of 47 U.S.C. § 227(c)(5) through conduct violating 47 C.F.R. § 64.1200(c)(2) and (d), as applied to solicitations to his wireless telephone number under 47 C.F.R. § 64.1200(e)").

When interpreting the TCPA, there are two potentially relevant timeframes: 1934, when Congress enacted the Communications Act, and 2003, when it passed the Do-Not-Call Implementation Act. But under either lens, the meaning of the term "residential"—as it modifies "telephone subscribers"—remains consistent. In ordinary usage, "residential" has long meant "used as a residence or by residents" or "relating to a residence." See Webster's Collegiate Dictionary (1936); Webster's New Collegiate Dictionary, Eleventh Ed. (2003). The statutory text thus contrasts subscribers who use a line for personal purposes in the home and those who subscribe for commercial use— not between landlines and mobile phones. Congress meant what it said: residential use, not the underlying technology, triggers protection. Any other reading arbitrarily limits the scope of the term "residential" to read "copper landline." No part of the statute contains a suggestion that the general term "residential" should be given such a limited, narrow meaning. Instead, the statute suggests, just as that there is a distinction between "residential" and "nonresidential," i.e. commercial, uses and purposes, regardless of the technologies used.

As such, "according to the TCPA's plain language and dictionary definitions of 'residence' and 'subscriber,' 'a residential subscriber is one who maintains a phone for residential purposes…i.e., for personal activities associated with his or her private,

domestic life.'" *Lirones v. Leaf Home Water Sols.,* LLC, No. 5:23-CV-02087, 2024
WL 4198134, at *6 (N.D. Ohio Sept. 16, 2024) (*citing Cacho v. McCarthy & Kelly*
LLP, No. 23-CV-11157 (LJL), 739 F. Supp. 3d 195, 206 (S.D.N.Y 2024)). In other
words, the analysis turns on how the subscriber uses the line, not what device or
technology they use it on. Indeed, as another court held last year:

> The best reading of the word "residential" is not that it modifies the
> "telephone," but rather that "residential" and "telephone" both modify
> the "subscriber." So rather than describe a "subscriber" who owns a
> "residential telephone," Section 227(c)(1) describes a "telephone
> subscriber" who has subscribed for "residential," i.e., personal,
> purposes. "Residential" is therefore used in the broader sense of
> "relating to a resident" to distinguish such a subscriber from a business
> or commercial telephone subscriber, who cannot be added to the Do
> Not Call registry.

*Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-CV-01569, 2024 WL 184449, at *5
(M.D. Pa. Jan. 17, 2024).

Indeed, the TCPA itself distinguishes between "business subscriber" and
"residential subscriber" in 47 U.S.C. § 227(a)(2)(A): "The term "established business
relationship" … "shall include a relationship between a person or entity and a business
subscriber subject to the same terms applicable under such section to a relationship
between a person or entity and a residential subscriber." (emphasis added). This shows
"Congress used the term 'residential' in the broader sense of 'relating to a resident' to
distinguish such a subscriber from a business or commercial telephone subscriber."
*Cacho*, 739 F. Supp. 3d at 206. This distinction "would make little sense if the term
'residential subscriber' referred to users with landlines physically located in their

residences, rather than users who use their phones for residential purposes, because many individuals operate home-based businesses." *Id.* at 207.

Thus, this Court need not even consider whether the FCC's interpretation that residential cell phones are eligible for registration on the National Do Not Call Registry has binding effect because the court can so hold so using the plain tools of statutory construction without regard to the FCC's interpretation as this Court's interpretation will be driven by traditional tools of statutory construction, which dictate the correct result, that residential cell phones can be registered on the DNC. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 374, 14 (2024) ("Courts interpret statutes, no matter the context, based on the traditional tools of statutory construction, not individual policy preferences.").

Moreover, "[T]he majority of courts throughout the country . . . have held that cell phones . . . are entitled to the TCPA's protection as residential telephones." *Tessu v. AdaptHealth, LLC*, No. SAG-23-0364, 2023 WL 5337121, at *5 (D. Md. Aug. 17, 2023). This is consistent with the plain, textualist reading of the TCPA articulated above.

### 4. Plaintiff need not plead damages and there is no "Treble Damages Claim" for the Court to dismiss.

ColourPop argues that Ms. Ferrell has not adequately pled her request for treble damages. But this argument reflects a fundamental misunderstanding of Rule 12(b)(6). There is no standalone claim for treble damages for knowing or willful

violation of the TCPA. Treble damages are a remedy, not a cause of action. *See* 47

U.S.C. § 227(c)(5); *see also, e.g.*, *Arrington v. Walgreen Co.*, 2010 WL 11507708, at

*1 (M.D. Fla. May 24, 2010) ("punitive damages is a remedy, not a cause of action").

A Rule 12(b)(6) motion is used to dismiss *claims*, not remedies. "Damages are but a

remedy," and since a request of such "neither constitutes a claim nor pertains to

whether any claim has been stated," there is "no basis for dismissal under

Fed.R.Civ.P. 12(b)(6)." *Elias v. Navasartian*, No. 1:15-CV-01567-LJO-GSA-PC,

2017 U.S. Dist. LEXIS 23229, 2017 WL 1013122, at *4 (E.D. Cal. Feb. 17, 2017)

("Recent court decisions have held that because a prayer for relief is a remedy and not

a claim, a Rule 12(b)(6) motion to dismiss for failure to state a claim is not a proper

vehicle to challenge a plaintiff's prayer for punitive damages, because Rule 12(b)(6)

only countenances dismissal for failure to state a claim.") (collecting cases).

    Even Courts that have not recognized that requests to dismiss requests for

damages under 12(b)(6) have declined to dismiss requests for treble damages based

on insufficient pleading. *See Pacleb v. Cops Monitoring*, No. 2:14-CV-01366-

CAS(JCx), 2014 U.S. Dist. LEXIS 91976, at *12-13 (C.D. Cal. July 7, 2014) (Court

denied a  motion to dismiss TCPA claim for willful violation, finding the allegation

that defendant's conduct constituted "multiple knowing and/or willful violations"

sufficient at the pleading stage); *Hashw v. Dep't Stores Nat'l Bank*, 986 F. Supp. 2d

1058, 1062 (D. Minn. 2013) (holding that a plaintiff need only allege that the

defendant "willfully . . . ma[de] the ATDS calls" to survive a motion to dismiss and

that specific intent to violate the statute need not be pleaded at the outset). Indeed, in interpreting the willful or knowing standard, courts require only that a party's actions were intentional, not that it was aware that it was violating the statute. *See, e.g.*, *Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147, 1151 (N.D. Ill. 2014) ("willful or knowing violation of TCPA requires only that defendant know of the facts constituting the offense"); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 U.S. Dist. LEXIS 37310 (N.D. Ill. Mar. 19, 2013) ("[T]he Court adopts the more common interpretation that 'willfully' or 'knowingly' simply requires that the act be intentional or volitional, as opposed to inadvertent, and not that defendant must have known that the conduct would violate the statute."). The same outcome is warranted here as these allegations go far beyond intentional conduct, which is all that is required.

### 5. *Plaintiff has standing to seek injunctive relief.*

For a statutory injunction, like under the TCPA, "Article III's standing requirement centers 'on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.'" *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) (quoting *Davis v. FEC*, 554 U.S. 724, 734, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008)). Particularly at this stage before there has been any discovery, the Plaintiff's allegations establish Article III standing to seek injunctive relief on behalf of the putative class. *See Owens-Benniefield v. Nationstar Mortg. LLC*, 258 F. Supp. 3d

1300, 1314-15 (M.D. Fla. 2017) (denying motion to dismiss prayer for injunctive

relief, explaining that "the TCPA . . . does allow a plaintiff to bring an action 'to

enjoin [further] violation' of § 227(b)") (quoting 47 U.S.C. § 227(b)(3)(A)); *Griffith*

*v. ContextMedia, Inc.,* 235 F. Supp. 3d 1032, 1033-35 (N.D. Ill. 2016) (holding,

based on allegations that defendants kept calling after being told to stop, that

"plaintiff's allegations—particularly those directed to her months-long efforts to stop

defendants' unwanted texts—are sufficient to entitle her to develop the factual record

as to whether injunctive relief is appropriate").

Indeed, another Court held the same in *Burke v. Credit One Bank, N.A.,* No.

8:18-cv-00728-EAK-TGW, 2019 U.S. Dist. LEXIS 62770, at *11-12 (M.D. Fla. Feb.

5, 2019) in a TCPA case:

> Plaintiff seeks injunctive relief in favor of both herself *and* the putative
> class. The Court cannot examine, at this juncture,
> whether injunctive relief is appropriate for members of the putative
> class, as the parties have not engaged in discovery and Plaintiff has not
> moved to certify the class. *See Snyder*, 258 F. Supp. 3d at 900-
> 01 (preliminarily finding that the named plaintiffs did not face a current
> threat of receiving telephone calls from the defendant, but conducting a
> standing analysis for the requested injunction—finding that the named
> plaintiffs had sufficiently demonstrated that class members continued to
> receive phone calls and a named plaintiff possessed a live claim
> for injunctive relief when she joined the lawsuit—where the parties had
> engaged in discovery and the named plaintiffs had moved for class
> certification). Indeed, Defendants ask the Court to dismiss or
> strike injunctive relief for presently unidentifiable class members prior to
> an opportunity for the putative class' certification. Defendants' request
> for the Court to dismiss or [*12]  strike Plaintiff's prayers
> for injunctive relief is therefore due to be denied.

*See also Wijesinha v. Bluegreen Vacations Unlimited, Inc.,* No. 19-20073-CIV, 2019

U.S. Dist. LEXIS 57136, at *18-19 (S.D. Fla. Apr. 3, 2019) (Denying similar motion

in TCPA case, holding "The Court is not determining an entitlement to treble

damages or injunctive relief at this juncture…Nor is it necessary a pleading establish

the four elements for injunctive relief — for example, whether the threatened injury

to the movant outweighs whatever damage the injunction may cause [*19]  a

defendant — as those would be the subject of a motion for injunctive relief and not a

listed remedy included in a pleading.")

Indeed, Courts interpreting the TCPA have repeatedly held that a plaintiff

"who is no longer receiving calls has Article III standing to seek injunctive relief for

a putative class, so long as the complaint plausibly alleges an ongoing practice that

threatens future violations against class members." *Snyder v. Ocwen Loan Servicing,

LLC*, 258 F. Supp. 3d 893, 900-01 (N.D. Ill. 2017); see also *Owens-Benniefield v.

Nationstar Mortg. LLC*, 258 F. Supp. 3d 1300, 1314-15 (M.D. Fla. 2017) (denying

motion to dismiss prayer for TCPA injunction). Otherwise, a telemarketer could

"cease calls to any individual the instant she is named as a plaintiff and thereby

indefinitely evade prospective relief, while continuing the unlawful practice against

everyone else." *Snyder*, 258 F. Supp. 3d at 901. That is precisely the danger alleged

here. Ms. Ferrell pleads that ColourPop systematically delivers marketing texts to

numbers on the National Do-Not-Call Registry without consent—conduct that, by

definition, continues to endanger thousands of consumers. (Compl. ¶ 3.) Those well-

pled allegations, accepted as true at this stage, establish a *real and immediate* threat

of future harm to absent class members. The Supreme Court has recognized that

when the time frame for the alleged injury is by nature temporary, a named plaintiff

can continue to pursue the interests of the class even after his own claim has been

rendered moot. Otherwise, a defendant could evade prospective injunctive relief

simply by inflicting harms that are too transitory to last the length of an entire lawsuit

or, in this case, by ceasing the alleged violations with respect to plaintiffs who step

forward." *Snyder v.Ocwen Loan Servicing, LLC*, 258 F. Supp. 3d 893, 901 (N.D. Ill.

2017) (citation omitted).

This Court should hold the same.

## CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety.

Alternatively, it should permit the Plaintiff to amend to correct any deficiencies.

Dated: June 24, 2025

By: */s/ Anthony I. Paronich*
Anthony I. Paronich
anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

*Attorney for Plaintiff and the putative Class*